# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | Cause No. CR-10-70-BLG-RFC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **KRISTI MAE LITTLE WOLF,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Defendant has filed a motion to suppress the admissions and statements made to law enforcement on January 5, 2010.  Defendant asserts that she was in custody and not properly Mirandized at the time of the interrogation.  The government opposes this motion.  A hearing was held on December 22, 2010.

## BACKGROUND FACTS

On January 5, 2010, DEA Special Agent Diane Jenkins, BIA Agent Tony Larvie, and BIA Police Officer Clayvin Herrera arrived at Defendant's home to interview her related to her involvement in alleged drug activity.

Defendant asserts that she allowed the three plain-clothed law enforcement officers into her home because they wanted to speak with her concerning an investigation of George Morris. Defendant was alone with her 4 month old child at the time of the questioning.

Defendant alleges that she was not advised that she was a suspect. Defendant asserts that during the questioning officers told her that she was not being truthful and they told her "we know everything, you might as well tell us." Defendant felt threatened when Special Agent Jenkins indicated that if she did not tell them everything she knew she would be looking at going away for ten years to life. Defendant was advised that "the more names, the more bonus points."

Defendant states that she was told to sit on the couch and felt isolated and intimidated. Law enforcement officers situated themselves around her in such a way that she did not feel like she could get up and walk away. Officer Herrera appeared to be "standing guard." Defendant states in her motion that she was

desperate to please the agents and make them stop questioning her.  She was also told "think about your kids."

The interview began at approximately 2:15 p.m.  At 3:30 p.m. Defendant was expecting her older children to be home from school and she went to the door to unlock it for them.  Law enforcement observed her go to the door and then asked Defendant if she had any illegal drugs in the home.  Defendant surrendered illegal drugs in her possession.

At no time was Defendant advised of her *Miranda* rights.

## ANALYSIS

In cases where the suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of Miranda if the suspect has been "deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602.  To determine whether the suspect was in custody, the Court must first examine the totality of the circumstances surrounding the interrogation.  *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).  The Court then ask whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 & n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

-3-

Applying this standard to an interrogation conducted within the home presents some analytical challenges, however, and presents an issue on which the Ninth Circuit has said little until recently in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). "The usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home." *Craighead*, 539 F.3d at 1082-1083.

An interrogation conducted within the suspect's home is not per se custodial. *See Beckwith v. United States*, 425 U.S. 341, 342-43, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). However, an interrogation in the suspect's home may be found to be custodial under certain circumstances. *See Orozco v. Texas*, 394 U.S. 324, 325-326, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned).

*Miranda* held that warnings were required when the person being interrogated was "in custody at the station or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court has held that certain essential salient features made

-4-

situations in which the suspect was "otherwise deprived of his freedom of action" similar to those in which the suspect was taken into custody at the police station, *id.*, specifically, "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445, 86 S.Ct. 1602 (stating that the salient feature was that the suspect was "cut off from the outside world").   In line with that reasoning, this Court considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a "police-dominated atmosphere."  *Craighead*, 539 F.3d at 1083.  Other circuits have adopted a similar approach when considering whether an in-home interrogation was "custodial" under *Miranda*.[1]

    The determination of whether an in-home interrogation was custodial "is necessarily fact intensive."  *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993).  Although the Ninth Circuit's opinion in *Craighead* "should not be

---

[1] *See, e.g., United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (concluding that the suspect's home had become a "police-dominated environment" because "the facts belie any conclusion that [the suspect's] home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning."); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding suspect was in custody although interrogated in his home because of the "level of physical control that the agents exercised over" the suspect); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996) ("More important than the familiarity of the surroundings where [the suspect] was being held is the degree to which the police dominated the scene."); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but ... the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting.").

-5-

interpreted as an exhaustive pronouncement," the Circuit identified several factors relevant to whether the circumstances of an in-home interrogation effectuate a police-dominated atmosphere: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.[2] *Craighead*, 539 F.3d 1084.

First, the Court must consider the number of law enforcement personnel and whether they were armed. *Id.* If a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free

---

[2] Other circuits have identified various lists of relevant factors for determining when an in-home interrogation is custodial. *See, e.g., Revels*, 510 F.3d at 1275 (10th Cir. 2007) (listing: whether the atmosphere was police dominated; whether the nature and length of the officers' questioning was accusatory or coercive; and whether the suspect was informed that statements were voluntary and she was free to leave); *Mittel-Carey*, 493 F.3d at 39 (1st Cir. 2007) (listing: whether the suspect was questioned in familiar surroundings; the number of law enforcement officers present; whether the suspect was restrained; and the character of the interrogation); *Sprosty*, 79 F.3d at 641 (7th Cir. 1996) (listing: whether "and to what extent" the suspect was informed that questioning was voluntary; whether police have employed subterfuge; the degree to which the interrogation is "police dominated"; whether the suspect was restrained; whether the suspect could reasonably believe he could terminate the interrogation and leave); *Griffin*, 922 F.2d at 1348-49 (8th Cir. 1990) (listing: purpose, place, and length of interrogation; whether the suspect was informed that he was free to leave; whether the suspect was restrained; whether the suspect initiated contact; whether strong arm tactics were employed; whether the atmosphere was police-dominated; whether the suspect was arrested at the termination of questioning). *Craighead*, 539 F.3d 1084, FN 3.

rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. *Id.* Also, if the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. *Id.* at 1085. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. *Id.* The presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere. *Id. See Mittel-Carey*, 493 F.3d at 38, 40 (finding that the presence of eight officers in the home, one of whom unholstered his gun, contributed to a police-dominated environment); *Revels*, 510 F.3d at 1270 (seven officers from two different agencies); *Sprosty*, 79 F.3d at 638, 642 (five officers, one of whom was visibly armed and in uniform, who surrounded the suspect in two police cars).

In this case, only three law enforcement officers entered Defendant's home. They were all dressed in plain clothes and none of the officers exhibited their weapons. Defendant testified that she did not even see any weapons or badges on the officers. The tone of the interview was cordial and Defendant was cooperative. Law enforcement did not threaten Defendant or raise their voices during the discussion.

Second, the Ninth Circuit considers whether the suspect was at any point restrained, either by physical force or by threats. *Id.* Defendant was not handcuffed or physically restrained in this case. The interview occurred in the living room of the house and Defendant was allowed to move about freely while law enforcement were in the home. At one point, Defendant even left the room where agents were sitting to unlock the door for her children because they were expected home from school. There was no evidence suggesting that the Defendant was prevented, in any way, from exiting her home through this same door.

Third, the Ninth Circuit considers whether the suspect was isolated from others. *Id.* at 1086. The Supreme Court highlighted isolation from the outside world as perhaps the crucial factor that would tend to lead a suspect to feel compelled to provide self-incriminating statements. *Miranda*, 384 U.S. at 445-46, 449-50, 86 S.Ct. 1602; *see also id.* at 448, 86 S.Ct. 1602 (raising the concern that interrogations conducted in private are difficult to monitor for abusive techniques and have been associated with past practices of unlawful interrogation).

In this case, Defendant was home alone with her infant when law enforcement arrived at the residence. Law enforcement did not attempt to isolate Defendant from others.

Fourth, the Ninth Circuit considers whether the suspect was informed that questioning was voluntary and that she was free to leave or terminate the interview. *Id.* If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody. *Griffin*, 922 F.2d at 1349.

The mere recitation of the statement that the suspect is free to leave or terminate the interview does not render an interrogation non-custodial per se. *Id.* at 1088. This Court must consider the delivery of these statements within the context of the scene as a whole. *Id.; See United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir.1982) (per curiam) (holding that an interrogation was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any time because the suspect was questioned in a closed FBI car for over an hour while police investigators searched the house). The Miranda test for custody does not ask whether the suspect was told that he was free to leave; the test asks whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (emphasis added).

Larvie testified at the suppression hearing that he began his conversation with Defendant by telling her that she did not have to talk to them and that she could ask them to leave at any time.  Defendant is a high school graduate and has completed three years of secondary education.  She certainly understood what she was being told.  This weighs against a finding of custody.

Defendant's Motion to Suppress is **DENIED**.

DATED this 7th day of January, 2011.

_/s/ Richard F. Cebull_____
RICHARD F.  CEBULL
U.S. DISTRICT COURT JUDGE